```
            UNITED STATES DISTRICT COURT
              DISTRICT OF MINNESOTA
            Civil No. 17-3456 (DSD/ECW)
```

Engineered Sales, Co.,
a Minnesota corporation,

   Plaintiff,

v.                **ORDER**

Endress + Hauser, Inc.,
an Indiana corporation,

and

Miller Mechanical Specialties, Inc.,
an Iowa corporation,

   Defendants.

  Steven C. Moore, Esq. and Watje & Moore, Ltd., 7900 Xerxes Avenue South, Suite 2000, Bloomington, MN 55431, counsel for plaintiff.

  Andrew M. McNeil, Esq. and Bose McKinney & Evans LLP, 111 Monument Circle, Suite 2700, Indianapolis, IN 46204 and Mark J. Carpenter, Esq. and Carpenter Law Firm PLLC, 5200 Willson Road, Suite 150, Edina, MN 55424, counsel for defendant Endress + Hauser, Inc.

  Peter J. Gleekel, Esq. and Larson King, LLP, 30 East 7th Street, Suite 2800, St. Paul, MN 55101, counsel for defendant Miller Mechanical Specialties, Inc.

This matter is before the court upon the partial motion for summary judgment by plaintiff Engineered Sales Co. (ESC) and the motions for summary judgment by defendants Endress + Hauser, Inc. (E+H) and Miller Mechanical Specialties, Inc. (MMS). Based on a review of the file, record, and proceedings herein, the court denies plaintiff's motion and grants defendants' motions.

## BACKGROUND

This business dispute arises out of E+H's termination of ESC's sales representative agreement.[1] E+H is an Indiana company that manufactures industrial instrumentation, including flow, level, pressure, temperature, and analytical products. E+H Answer ¶ 2. ESC is a manufacturer's representative and distributor for industrial instrumentation and controls based in Minnesota. Compl. ¶ 1; Engstrand Dep. at 27:14-16; Gleekel Decl. Ex. L at 1.

In 2000, E+H contacted Dan Engstrand, president of ESC, about becoming a sales representative for its product line in Minnesota, North Dakota, South Dakota, and northwest Wisconsin. Engstrand Dep. at 40:11-41:8, 36:16-37:3. E+H had been working with another Minnesota company, Control-Tec, but wanted more sales coverage in the territory as its business expanded. Id. at 39:24-40:22. E+H encouraged ESC to effectively acquire Control-Tec and take over as the E+H representative in the territory. Id. at 40:23-42:31 54:21-55:11. Over the course of several months, ESC and Control-Tec negotiated a deal under which ESC paid $100,000 to acquire Control-Tec.[2] Id. at 51:10-53:25; 54:21-55:6. Engstrand initiated the

---

[1] After full briefing of the pending motions, ESC conceded that certain of its claims are no longer viable. The court will discuss only those facts relevant to the remaining claims.

[2] Engstrand sold ESC's competing product lines to a third party. Engstrand Dep. at 45:21-49:23. The court will not discuss that transaction in detail because it is irrelevant to the issues presented.

discussion with Control-Tec, and E+H was not involved in the negotiations. Id. at 45:2-5, 71:20-72:4. ESC did not make any payment to E+H relating to its buy out of Control-Tec. Id. at 56:20-57:6.

On January 1, 2001, ESC and E+H entered into an exclusive representative agreement (Agreement) under which E+H appointed ESC as its "independent sales representative to sell [E+H's] specified products" in Minnesota, North Dakota, South Dakota, and portions of Wisconsin. Gleekel Decl. Ex. J at 1, 15. The Agreement designates ESC as an "independent contractor" and provides that either party may terminate the agreement "with or without cause" with thirty days' written notice. Id. §§ 1(b), 13. The Agreement does not require ESC to pay E+H a royalty fee for becoming a sales representative, nor does it require ESC to pay a percentage of gross or net sales to E+H. See id.; Engstrand Dep. at 302:21-304:8.

The Agreement prohibits ESC from selling competing products, but permits ESC to continue selling products for certain identified industrial process manufacturers, referred to as "principals."[3] Gleekel Decl. Ex. J § 4; id. App'x C. Among those approved principals is Mine Safety Appliances (MSA). Id. App'x. C. The parties later modified certain aspects of the Agreement through

---

[3] ESC also represented manufacturers in the HVAC and water and wastewater industries. Gleekel Decl. Ex. L at 17-21.

several written addenda. See Lucey Decl. Ex. A. The last modification was in September 2010. Id. at 7.

In approximately 2013, E+H began consolidating its representatives throughout the country. Engstrand Dep. at 80:18-81:3; 140:13-21. Engstrand agreed that consolidation, particularly in the Midwest, made sense and, in 2014, began discussions with defendant MMS, an E+H representative in Iowa, about the possibility of merging. Id. at 136:2-40:2, 158:14-59:18. Meanwhile, E+H had growing concerns about ESC's sales capacity in the Bakken Shale Region in North Dakota and its flat sales generally. Camin Dep. at 8:22-10:25. E+H was also concerned that ESC did not have a succession plan in place. Engstrand Dep. at 202:3-204:10; Lucey Dep. at 58:22-60:2. Given its concerns and its preference for consolidated sales representatives, E+H favored a merger between MMS and ESC. Camin Dep. at 11:1-8; Sauers Dep. at 7:14-8:11. E+H became involved in the discussions between ESC and MMS, even signing a non-disclosure agreement (NDA) to maintain the confidentiality of the information exchanged. Gleekel Decl. Ex. D. The NDA precludes the distribution, disclosure, or dissemination of confidential information exchanged under its terms. Id. § 3(b). Confidential information includes:

> any information and data of a confidential nature, including but not limited to proprietary, developmental, technical, marketing, sales, operating, performance, cost, know-how, business and process information, computer programming techniques, and all record bearing media containing or disclosing such information and

4

techniques ... disclosed pursuant to [the NDA].

Id. § 1. Confidential information does not include information "already in the public domain" or information "subsequently independently developed by the receiving party." Id. §§ 4(a), (d). Under the NDA, ESC provided MMS with, among other things, sales data that included summaries of its business with principals other than E+H, including MSA. See P. Miller Dep. Ex. 100 at 5-7, 9. The data shows that two-thirds of ESC's revenue came from E+H and that MSA was its third highest revenue producing principal. See id.

Apparently unbeknownst to ESC, E+H communicated regularly with MMS throughout its negotiations with ESC. Although E+H characterizes its role as one of an "interested observer," the record establishes otherwise. It appears that E+H ultimately determined that MMS should acquire, rather than merge with, ESC and that it directed negotiations accordingly. See Camin Dep. Exs. 60, 81, 82; Sauers Dep. Exs. 63, 77, 79. Throughout the negotiations, E+H told Engstrand that it may simply terminate the Agreement if ESC could not work out a deal with MMS. Camin Dep. at 95:7-24, 101:7-23.

On June 5, 2015, after many months of negotiating, MMS offered to purchase ESC for $1.1 million. See P. Miller Dep. Ex. 99. On June 15, 2015, Engstrand declined the offer and countered with a proposed purchase price of $1.62 million based on undisclosed

"independent appraisals." Sauers Dep. Ex. 40 at 1, 2. MMS responded that it would keep its offer open until 12:01 a.m. on June 16, 2015. Id. at 1. E+H weighed in the evening of June 15, indicating that it would terminate ESC if it could not reach agreement with MMS. Camin Dep. Ex. 84. ESC did not agree to MMS's terms and, on June 16, 2015, E+H terminated the Agreement, effective July 17, 2015.[4] Sauers Dep. Ex. 86. E+H then appointed MMS as its sales representative in ESC's former territory. P. Miller Dep. at 111:11-12:25.

E+H confirmed that, under the Agreement, it would pay ESC full commissions on outstanding quotes from July 16, 2015, to August 15, 2015, and fifty-percent commissions on verified outstanding quotes from August 16, 2015, to September 15, 2015. Engstrand Dep. Ex. 43 at 1, 4. E+H also confirmed that ESC would receive no commissions for orders received after September 16, 2015, or for orders shipped after July 15, 2016. Id. at 4. E+H requested that ESC provide any outstanding special project quotes that E+H did not have access to so that it could ensure full commission payment. Id. at 1. On July 16, Engstrand provided a list of quotes to E+H and noted that all of those quotes were already in the E+H database. Id. Ex. 45 at 1. Later that month, Engstrand accused E+H of withholding commissions due to ESC. Id. Ex. 46 at 2. E+H denied improperly

---

[4] E+H also terminated the parties' outsourcing agreement, which is not at issue. See Sauers Dep. Ex. 86.

6

withholding commissions and explained that ESC was not entitled to commissions on expired quotes. Id. at 1. In his deposition, Engstrand conceded that E+H paid all commissions due to ESC under the Agreement and was unable to identify additional commissions due and owing. Engstrand Dep. at 288:11-92:5.

Soon after ESC's termination, MMS contacted MSA and began discussions about MMS becoming MSA's sales representative. P. Miller Dep. Ex. 108; P. Miller Dep. at 125:12-22. MMS was aware that MSA was a market leader in the gas-detection industry and knew that ESC was its current sales representative. P. Miller Dep. at 125:15-22, 127:10-28:18. Travis Sauers, a regional sales manager for E+H, had a friend who worked at MSA and knew that MSA had been unhappy with ESC for some time. Sauers Dep. at 6:9-15, 39:2-21. ESC was aware that MSA was concerned about ESC's sales volume. Engstrand Dep. at 327:17-22. Sauers denies encouraging MSA to terminate its relationship with ESC in favor of MMS and also denies providing MMS with MSA sales data. Sauers Dep. at 39:6-40:9.

In January 2017, eighteen months after E+H terminated ESC, MSA replaced ESC with MMS as its sales representative. P. Miller Dep. at 130:22-31:1; Engstrand Dep. at 297:18-22.

On July 12, 2017, ESC commenced this action in Hennepin County District Court raising the following six claims: (1) E+H and MMS breached the NDA by using ESC's confidential information to solicit ESC employees and principals; (2) E+H and MMS tortiously interfered

7

with ESC's prospective economic advantage by using ESC's confidential information to induce ESC employees and principals to terminate their relationships with ESC; (3) E+H tortiously interfered with ESC's prospective economic advantage by interfering with ESC's negotiations with MMS; (4) E+H violated the Minnesota Franchise Act (MFA), Minn. Stat. § 80C.01, et seq., by terminating its relationship with ESC without good cause; and (5) E+H violated the Minnesota Termination of Sales Representative Act (MTSRA), Minn. Stat. § 325E.37, by terminating its relationship with ESC without good cause; and (6) E+H violated Minn. Stat. § 181.145 by failing to promptly pay ESC earned commissions. Defendants timely removed and now move for summary judgment.[5] ESC moves for partial summary judgment on its MFA claim against E+H.

**DISCUSSION**

**I.   Summary Judgment Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). A fact is material only when its resolution affects the outcome of

---

[5] ESC has since conceded that is has no damages, and thus no claims, relating to E+H's alleged interference with ESC's negotiations with MMS and with respect to solicitation of ESC employees. ECF Nos. 65 at 19 n.15, 66 at 8 n.3. Therefore, the court will not address those issues.

the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party.  Id. at 252.

On a motion for summary judgment, the court views all evidence and inferences in a light most favorable to the nonmoving party. Id. at 255.  The nonmoving party, however, may not rest on mere denials or allegations in the pleadings but must set forth specific facts sufficient to raise a genuine issue for trial.  Celotex, 477 U.S. at 324.  A party asserting that a genuine dispute exists - or cannot exist - about a material fact must cite "particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A).  If a plaintiff cannot support each essential element of a claim, the court must grant summary judgment because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial.  Celotex, 477 U.S. at 322-23.

## II. Breach of Contract

ESC alleges that E+H and MMS breached the NDA by using ESC's confidential information to identify MSA as a valuable principal and to ultimately lure MSA away from ESC.  ESC bases this claim on the fact that it shared projected gross profits for its top manufacturers - including MSA - under the NDA and because MMS only approached MSA after receiving that information.  ESC also argues that E+H helped MMS pursue MSA after becoming privy to its sales

data because it wanted MMS to represent other product lines.

But ESC has failed to cite to any actual facts in support of its contention that MMS breached the NDA. Instead, ESC's claim is based on pure conjecture. ESC ignores the fact that MSA was known as a market leader before the parties signed the NDA, and thus was a desirable manufacturer to represent. See Engstrand Dep. at 299:20-300:4. In other words, the information at issue was "already in the public domain" and thus not covered by the NDA. See Gleekel Decl. Ex. D § 4(a). Further, Engstrand admits that he and MMS discussed keeping MSA in lieu of a competitor in the event of a merger. Engstrand Dep. at 321:8-23:11. He does not allege that those discussions were covered by the NDA. Absent some evidence that MMS used the sales data provided by ESC to target MSA, the court must find in favor or MMS on this claim.[6] See Sip-Top, Inc. v. Ekco Group, Inc., 86 F.3d 827, 830 (8th Cir. 1996) ("When the record contains no proof beyond speculation to support the verdict, judgment as a matter of law is appropriate.").

The record is equally devoid of any facts to establish that E+H breached the NDA. The fact that E+H may have wanted MMS to have a more diverse product portfolio does not establish that E+H

---

[6] The court is unpersuaded by MMS's argument that the sales data was not properly marked as confidential as required by the NDA. The enclosure letter makes clear that Engstrand intended the documents to be kept confidential and he was not required to mark each page as confidential to effectuate that intent. See P. Miller Dep. Ex. 100 at 1.

used ESC's confidential information to identify MSA as a possible principal for MMS. Indeed, as noted, MSA was a well-known market leader in the gas-detection industry and its value to E+H and MMS was evident even without ESC's sales data. Based on the record, the court cannot conclude that E+H breached the NDA as alleged.

**III. Tortious Interference**

ESC alleges that E+H and MMS tortiously interfered with its economic advantage by targeting MSA. ESC pins this claim on E+H's and MMS's use of its confidential information. See ECF No. 66 at 7. As discussed above, ESC does not have a viable claim that either E+H or MMS improperly used ESC's confidential information. As a result, ESC's claim for tortious interference also fails as matter of law.

**IV. Violation of the Minnesota Franchise Act**

ESC argues that it was an E+H franchisee and that, as a result, it could only be terminated for good cause under the MFA. See Minn. Stat. § 80C.14, subdiv. 3(b). E+H denies that ESC was a franchisee and argues that it was entitled to terminate ESC with thirty days' notice for any reason under the Agreement.

Under the MFA, a plaintiff claiming a franchise relationship must prove: (1) a right granted in the franchisee to engage in the business of offering or distributing goods using the franchisor's trade name, trademark, advertising or other commercial symbol, (2) a "community of interest" in the marketing of goods or services

11

between the franchisee and franchisor, and (3) the franchisee paid, directly or indirectly, a "franchise fee." Minn. Stat. § 80C.01, subdiv. 4; Martin Investors, Inc. v. Vander Bie, 269 N.W.2d 868, 874 (Minn. 1978). E+H argues that ESC has failed to establish the second and third elements.

With respect to "community of interest," E+H denies that ESC sold goods under E+H's trade name. Rather, when ESC sold products, it represented itself to customers as ESC, not E+H. Engstrand Dep. at 302:21-25. But the statute does not require that the alleged franchisee operate under the franchisor's name; it merely requires a common interest in the marketing of goods and services. Minn. Stat. § 80C.01, subdiv. 4(ii). The court is satisfied that ESC has established this element.

As to the required franchise fee, ESC argues that the $100,000 it paid to acquire Control-Tec constituted a franchise fee. A "franchise fee" is any fee or charge that a franchisee is required to pay "for the right to enter into a business or to continue a business under a franchise agreement." Minn. Stat. § 80C.01, subdiv. 9. A franchise fee can include, but is not limited to, initial capital investment fees, fees based on a percentage of gross or net sales, payments for goods or services, and training fees or charges. Id.

There is no real dispute that ESC did not pay a direct franchise fee to E+H. That is, ESC did not pay E+H for the right

12

to become its sales representative. The parties disagree, however, as to whether the ESC's acquisition of Control-Tec was an indirect franchise payment. The court finds that it did not. ESC paid Control-Tec to acquire its assets in an agreement separate and distinct from its agreement with E+H. E+H was not involved in the negotiations, was not a party to the agreement, and received no fee, directly or indirectly, from the transaction.

Moreover, the Agreement establishes that parties did not intend to have franchisee/franchisor relationship. The Agreement identifies ESC as its "independent sales representative" and an "independent contractor" rather than a franchisee. Gleekel Decl. Ex. J §§ 1(a), (b). And, in contrast with the MFA, the Agreement specifically provides that either party may terminate the agreement for any reason with thirty days' written notice. Id. § 13. Had the parties wanted to create a franchise relationship, they could have easily done so.

Because ESC and E+H did not have a franchise relationship, ESC cannot maintain its claim under the MFA. As a result, the court must grant E+H's motion for summary judgment on this claim and deny ESC's motion for partial summary judgment.

## V. Violation of the Minnesota Termination of Sales Representative Act

The MTSRA prohibits a manufacturer from terminating a sales representative agreement absent "good cause." Minn. Stat. § 325E.37, subdiv. 2(a). The manufacturer is required to give

13

ninety days' written notice setting forth the reason for the termination, and the recipient then has sixty days to correct the stated reason for termination. Id.

ESC argues that E+H violated the MTSRA by terminating the Agreement without cause and with only thirty days' notice. According to E+H, the MTSRA does not apply because the Agreement expressly states that it is governed by Indiana law. See Gleekel Decl. Ex. J § 15(a). In 2014, however, the Minnesota legislature amended the MTSRA to prohibit choice-of-law provisions providing for the application of the laws of other states. Minn. Stat. § 325E.37, subdiv. 7. The question is whether that amendment applies to the Agreement and renders the parties' choice-of-law provision unenforceable.

The 2014 amendment to the MTSRA became effective on August 1, 2014, as to "sales representative agreements entered into, renewed or amended on or after that date." Apex Tech. Sales, Inc. v. Leviton Mfg., Inc., No. 17-2019, 2017 WL 2731312, at *4 (D. Minn. June 26, 2017) (quoting 2014 Minn. Sess. Law Serv. Ch. 165 (S.F. 2108)). Here, the parties agree that the Agreement was not amended on or after August 1, 2014. ESC argues, however, that the Agreement was "renewed" because ESC solicited orders on E+H's behalf after that date.

ESC relies on a 1991 amendment to the MTSRA which defines the term "renewed" in the context of establishing whether revisions

14

made to the MTSRA in 1991 applied to existing sales representative agreements. See 1991 Minn. Sess. Law Serv. Ch. 190 (H.F. 786) §§ 1, 2(a)(2). The legislature provided that the revisions made to section 1 of the MTSRA applied to sales representative agreements "entered into or renewed on or after the effective date of t[he] act." Id. § 2(a). The legislature further provided that a sales representative agreement is "renewed" in this context if "the agreement is for an indefinite period, and with the principal's consent or acquiescence, the sales representative solicits order on or after the effective date of section 1." Id. § 2(a)(2).

According to ESC, this definition of "renewed" should also be applied to the 2014 amendment. The court disagrees. The 1991 amendment applies specifically to the revisions to section 1 of the MTSRA, and the court is unpersuaded that the legislature intended for it to broadly apply to all provisions of the MTSRA, including subsequent amendments relating to other aspects of the act. The 2014 amendment does not incorporate the earlier amendment, nor does it independently define "renew."

The court must therefore look to the plain meaning of "renew" in interpreting the 2014 amendment. Shire v. Rosemount, Inc., 875 N.W.2d 289, 292 (Minn. 2016). Black's Law Dictionary defines "renew" as "the act of restoring or reestablishing." Garner, Black's Law. Dict. at 1410 (9th ed. 2009). Merriam-Webster likewise defines "renew" as "to make like new." Merriam-Webster

15

Collegiate Dictionary 990 (10th ed. 1993). Because the Agreement did not contain an expiration date, it is not possible for it to be "renewed" as that term is commonly understood.

As a result, the court concludes that the 2014 amendment does not apply and that the parties' choice-of-law provision is enforceable. E+H is entitled to summary judgment on this claim.

**VI. Unpaid Commissions**

ESC argues that E+H failed to pay it commissions as required under Minn. Stat. § 181.145. This claim is premised on application of the MTSRA. Because the court has concluded that ESC does not have a viable claim under the MTSRA, this claim also fails as a matter of law.

**CONCLUSION**

Accordingly, based on the above, **IT IS HEREBY ORDERED** that

1. Defendant Miller Mechanical Specialties, Inc.'s motion for summary judgment [ECF No. 28] is granted;

2. Plaintiff's motion for partial summary judgment [ECF No. 30] is denied;

3. Defendant Endress + Hauser, Inc.'s motion for summary judgment [ECF No. 32] is granted; and

4. The case is dismissed with prejudice.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: February 27, 2019

s/David S. Doty
David S. Doty, Judge
United States District Court
